Filed 3/30/22  P. v. Major CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

|   |   |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>SHANE ALLEN MAJOR,<br><br>    Defendant and Appellant. | E077655<br><br>(Super.Ct.No. FVI011354)<br><br>OPINION |

APPEAL from the Superior Court of San Bernardino County. Christopher S. Pallone, Judge. Affirmed.

Anthony J. Dain, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Alan L. Amann and Daniel J. Hilton, Deputy Attorneys General, for Plaintiff and Respondent.

1

After an evidentiary hearing, the trial court denied Shane Allen Major's petition to vacate his first degree murder conviction under Penal Code section 1170.95. The court found, beyond a reasonable doubt, that although Major was not the actual killer, he was a major participant in the underlying robbery and acted with reckless indifference to human life. On appeal, Major argues there was insufficient evidence to support this conclusion. We disagree and affirm.

## I.  FACTS

On March 4, 2000, Major, Jason Carlisle, and Brian Shumway met up with the intention of robbing a drug dealer, Cheryl Haas. Major set up a drug deal, and the men tried to meet Haas at a fast food restaurant. At first they weren't able to find Haas at the restaurant. Nevertheless, all three confirmed they were still committed to the plan.

The men eventually successfully contacted and met up with Haas. Major got in Haas's vehicle and the other two men followed in a different vehicle. They drove to a dirt field in Victorville. Major and Haas got out of her vehicle, and Major asked Shumway to get him a tire iron. Major then began to beat Haas with a metal tool—Carlisle testified it was a crowbar, though it seems likely it could've been the tire iron Haas requested. Major apparently had some pre-existing animosity toward Haas over something that happened to a friend for which he held Haas responsible. As he was beating Haas, Major yelled that "this was payback for what happened to his homeboy." Haas fell to her knees.

Once Haas was on the ground, Shumway got into her vehicle and ran her over. Shumway then turned around and ran her over a second time. These events happened

very fast, and Carlisle later testified that he couldn't be sure of the exact timeframe. Major didn't say anything to Shumway before Shumway ran Haas over. Carlisle also later testified that he didn't know why Shumway ran her over.

The three men then drove back to Carlisle's mother's house in both vehicles. Major took Haas's purse and Shumway cleaned Haas's vehicle. Carlisle and Major drove Haas's vehicle to an aqueduct. On the way, Major told Carlisle, " 'I don't think I need to tell you what's going to happen to you if you say anything.' "

Carlisle eventually spoke to the police. He initially told them Major ran over Haas. However, he later changed his story, saying Shumway ran her over. He said he initially lied because he was high and afraid, and that during his second meeting with police he was sober and truthful.

In 2000 the San Bernardino County District Attorney's office charged Carlisle, Major, and Shumway with first degree murder (Pen. Code, § 187, subd. (a), unlabeled statutory citations refer to this code), robbery (§ 211), and kidnapping to commit robbery (§ 209, subd. (b)(1).) The prosecution also alleged each used a deadly and dangerous weapon, a car. (§ 12022, subd. (b)(1).) In 2003 Major pled guilty to first degree murder in exchange for the prosecution dismissing all other charges and allegations.

In 2020, Major filed a petition for resentencing under section 1170.95. The trial judge determined the petition made a prima facie case and ordered an evidentiary hearing on the merits. Carlisle testified against Major at the hearing, and Major didn't present any affirmative evidence in his favor. After hearing evidence and argument, the judge denied

3

the petition, finding beyond a reasonable doubt that Major was not entitled to relief because he was a major participant in the robbery who acted with reckless indifference to human life.

## II.  ANALYSIS

Major argues the court's finding is not supported by sufficient evidence. We disagree.

### A.  *Section 1170.95*

Senate Bill No. 1437, which became effective on January 1, 2019, "addresses certain aspects of California law regarding felony murder and the natural and probable consequences doctrine by amending Penal Code sections 188 and 189." (*People v. Martinez* (2019) 31 Cal.App.5th 719, 722.) Under section 189 as amended, " 'murder liability is not imposed on a person who is not the actual killer, did not act with the intent to kill, or was not a major participant in the underlying felony who acted with reckless indifference to human life.' " (*People v. Clements* (2022) 75Cal.App.5th 276, 290 (*Clements*).)

In order to seek resentencing under section 1170.95, a petitioner must first file a petition meeting certain standards and alleging they are eligible for relief. (§ 1170.95, subds. (a), (c).) If the petitioner would be entitled to relief were his factual allegations true, the judge must then issue an order to show cause. (*People v. Lewis* (2021) 11 Cal.5th 952, 971.) Once the judge has issued an order to show cause, they must hold "a hearing to determine whether to vacate the murder, attempted murder, or manslaughter

conviction and to recall the sentence and resentence the petitioner." (§ 1170.95, subd. (d)(1).) "At the hearing to determine whether the petitioner is entitled to relief, the burden of proof shall be on the prosecution to prove, beyond a reasonable doubt, that the petitioner is guilty of murder or attempted murder." (§ 1170.95, subd. (d)(3).) "A finding that there is substantial evidence to support a conviction for murder . . . is insufficient to prove, beyond a reasonable doubt, that the petitioner is ineligible for resentencing." (§ 1170.95, subd. (d)(3), as amended by Stats. 2021, ch. 551, § 2.) Therefore "the People ha[ve] the burden to prove the record of conviction and any new or additional evidence the parties submit establish beyond a reasonable doubt that [the petitioner] committed murder under the amended law." (*Clements*, *supra*, 75 Cal.App.5th at p. 294.)

When reviewing a sufficiency of the evidence claim, we must determine " ' "whether, on the entire record, a rational trier of fact could find the defendant guilty beyond a reasonable doubt." ' " (*People v. Smith* (2005) 37 Cal.4th 733, 738-739; *People v. Johnson* (1980) 26 Cal.3d 557, 578.) Substantial evidence is "evidence which is reasonable, credible, and of solid value." (*People v. Johnson*, at p. 578.) We view the evidence in a light most favorable to the judgment and "resolve all evidentiary conflicts and questions of credibility 'in favor of the verdict.' " (*People v. Brady* (2018) 22 Cal.App.5th 1008, 1014, quoting *People v. Cardenas* (2015) 239 Cal.App.4th 220, 226-227.) We may not reverse the judgment "unless it appears 'that upon no hypothesis whatever is there sufficient substantial evidence to support [the conviction].' " (*People v.*

*Bolin* (1998) 18 Cal.4th 297, 331, quoting *People v. Redmond* (1969) 71 Cal.2d 745, 755.)

      B. *Major Participant Who Acted with Reckless Indifference to Human Life*

          1. *The Tison-Enmund Spectrum*

Section 189 defines major participation and reckless indifference by referencing section 190.2, subdivision (d). Section 190.2, subdivision (d), was enacted in 1990 to bring state law into conformity with prevailing Eighth Amendment doctrine, as set out in the United States Supreme Court's decision *Tison v. Arizona* (1987) 481 U.S. 137 (*Tison*). (*People v. Banks* (2015) 61 Cal.4th 788, 798 (*Banks*).) Both of these cases involved defendants who were not the actual killers but who participated in an underlying felony during which one of their codefendants killed. In both cases the defendants were sentenced to death, and they asked the court to determine whether the death penalty could apply to those only vicariously liable for a killing.

Our Supreme Court adopted the standard developed in these cases to assess culpability in two cases of its own, *Banks* and *People v. Clark* (2016) 63 Cal.4th 522 (*Clark*). Thus, assessing whether a defendant was a major participant who acted with reckless indifference to human life requires us to consider both the United States Supreme Court's explanation of this standard and our own Supreme Court's clarification.

In *Enmund v. Florida* (1982) 458 U.S. 782 (*Enmund*) the defendant "drove two armed confederates to [Thomas] Kersey's house and waited nearby while they entered. When Kersey's wife appeared with a gun, the confederates shot and killed both Kerseys.

Enmund thereafter drove his confederates away from the scene and helped dispose of the murder weapons." (*Banks*, *supra*, 61 Cal.4th at p. 799.) The United States Supreme Court reversed Enmund's death sentence and "held the Eighth Amendment bars the death penalty for any felony-murder aider and abettor 'who does not himself kill, attempt to kill, or intend that a killing take place or that lethal force will be employed.' " (*Ibid.*)

In contrast, in *Tison*, "[p]risoner Gary Tison's sons Ricky, Raymond, and Donald Tison conducted an armed breakout of Gary and his cellmate from prison, holding guards and visitors at gunpoint. During the subsequent escape, their car, already down to its spare tire, suffered another flat, so the five men agreed to flag down a passing motorist in order to steal a replacement car. Raymond waved down a family of four; the others then emerged from hiding and captured the family at gunpoint. Raymond and Donald drove the family into the desert in the Tisons' original car with the others following. . . . Gary and his cellmate then killed all four family members." (*Banks*, *supra*, 61 Cal.4th at p. 799.) In that case the United States Supreme Court laid out a spectrum of culpability, with minor actors like Enmund on one side and actual, intentional, or attempted killers on the other. (*Tison*, *supra*, 481 U.S. at pp. 149-150.) Between those two extremes, "major participation in the felony committed, combined with reckless indifference to human life, is sufficient to satisfy the *Enmund* culpability requirement" in order to apply the death penalty. (*Id.* at p. 158.) The court concluded that the Tisons met this standard, and therefore the constitution did not prohibit sentencing them to death.

7

Thus, *Tison* and *Enmund* establish two points along a spectrum of culpability. On one end is Enmund, the quintessential getaway driver, who could not be put to death over his involvement in the felony which resulted in two deaths. Somewhere further along are the Tisons, who the court concluded could be put to death because they were major participants in the underlying felony who acted with reckless indifference to human life.

  2. *Banks* and *Clark*

In *Banks* and *Clark*, our Supreme Court considered this spectrum in the context of California's death penalty. In doing so, it clarified what constituted "major participation" and "reckless indifference to human life" under California law for these purposes.

In *Banks*, *supra*, 61 Cal.4th at p. 794, our Supreme Court considered "under what circumstances an accomplice who lacks the intent to kill may qualify as a major participant." The court set out a number of factors relevant to assessing whether a given defendant was a major participant, namely: "What role did the defendant have in planning the criminal enterprise that led to one or more deaths? What role did the defendant have in supplying or using lethal weapons? What awareness did the defendant have of particular dangers posed by the nature of the crime, weapons used, or past experience or conduct of the other participants? Was the defendant present at the scene of the killing, in a position to facilitate or prevent the actual murder, and did his or her own actions or inaction play a particular role in the death?" and "[w]hat did the defendant do after lethal force was used?" (*Id.* at p. 803.) The court counseled that no one factor was determinative but that "[a]ll may be weighed in determining the ultimate question,

8

whether the defendant's participation 'in criminal activities known to carry a grave risk of death' [citation] was sufficiently significant to be considered 'major.' " (*Ibid*.)

In *Clark*, our Supreme Court summarized the necessary state of mental culpability as "encompass[ing] a willingness to kill (or to assist another in killing) to achieve a distinct aim, even if the defendant does not specifically desire that death as the outcome of his actions." (*Clark*, *supra*, 63 Cal.4th at p. 617.) The court cited the Model Penal Code's definition of recklessness approvingly, which requires a person " 'consciously disregard[] a substantial and unjustifiable risk that the material element exists or will result from his conduct. The risk must be of such a nature and degree that, considering the nature and purpose of the actor's conduct and the circumstances known to him, its disregard involves a gross deviation from the standard of conduct that a law-abiding person would observe in the actor's situation.' " (*Ibid.*) "This definition encompasses both subjective and objective elements. The subjective element is the defendant's conscious disregard of risks known to him or her. But recklessness is not determined merely by reference to a defendant's subjective feeling that he or she is engaging in risky activities. Rather, recklessness is also determined by an objective standard, namely what 'a law-abiding person would observe in the actor's situation.' " (*Ibid.*)

In order to aid courts and juries considering whether a defendant acted with reckless indifference to human life, the court offered another list of nonexclusive factors, much like it did in *Banks*. These factors are (1) the defendant's "[k]nowledge of [w]eapons, and [u]se and [n]umber of [w]eapons"; (2) their "[p]hysical [p]resence at the

9

[c]rime and [o]pportunities to [r]estrain the [c]rime and/or [a]id the [v]ictim"; (3) the "[d]uration of the [f]elony"; (4) the defendant's knowledge of the likelihood his cohorts will kill; and (5) their "[e]fforts to [m]inimize the [r]isks of [v]iolence [d]uring the [f]elony." (*Clark*, *supra*, 63 Cal.4th at pp. 618-621.) The court made clear that as with the *Banks* factors that " '[n]o one of these considerations is necessary, nor is any one of them necessarily sufficient.' " (*Id.* at p. 618.)

C.     *Sufficiency of the Evidence*

Major concedes that he was a major participant in the underlying felony. However, he argues the prosecution failed to prove that he acted "with reckless indifference to human life."

Given the *Clark* factors, we conclude substantial evidence exists to support the trial judge's conclusion Major acted with reckless indifference to human life. Major asked for, received, and used a potentially deadly weapon in the form of either a tire iron or crowbar. Though this was not the actual murder weapon, he had knowledge of and actually used a makeshift weapon that was available to him and could easily have become a deadly weapon. Major was also physically present throughout the whole crime, and physically present for the murder. Yet far from restraining the crime or rendering aid, Major viciously attacked the victim, driving her to the ground and making it next to impossible for her to move or otherwise protect herself from his accomplice's fatal attack. Major also made absolutely no effort to minimize the risk of violence during the underlying felony. Instead, Major was the first person to escalate the violence by

10

attacking Haas unprovoked. Major even told Haas that this attack was revenge for some other slight, suggesting that violence was the point of the robbery all along. Finally, there is no evidence Major attempted to stop Shumway after either the first or second time he ran Haas over.

The only *Clark* factors that do not weigh against Major are that everything happened quickly and there is not much evidence regarding Major's knowledge of Shumway's predisposition to kill or lack thereof. However, this minimally mitigating evidence doesn't change the fact there is ample evidence Major otherwise consciously disregarded a substantial and unjustifiable risk of death, and that his conduct involved " 'a gross deviation from the standard of conduct that a law-abiding person would observe in the actor's situation.' " (*Clark*, *supra*, 63 Cal.4th at p. 617.)

In short, Major is much closer to the Tison end of the spectrum than the Enmund end. Major planned the crime and was the first person to escalate the violence used to effectuate it. Indeed, given his actions, it's entirely possible that for Major, robbing Haas was secondary to hurting her. Given his willingness to use excessive force unprovoked, and his failure to do anything to otherwise mitigate the threat of death, there was ample evidence to support the trial judge's finding that he acted with reckless indifference to human life.

Accordingly, we conclude there was sufficient evidence to support the trial judge's finding that Major was not entitled to resentencing under section 1170.95.

11

## III. DISPOSITION

We affirm.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

SLOUGH _____
                                                    J.

We concur:


RAMIREZ _____
                        P. J.


CODRINGTON _____
                        J.